The next case this morning is 522-0703, People v. Parke. Arguing for the appellant is Levi Harris. Arguing for the appellee is Victoria Joseph. Each side will have ten minutes for their argument. The appellant will also have five minutes for rebuttal. Please note only the clerk of the court is permitted to record these proceedings today. Good morning, counsel, and good morning to our guests here today. This is the matter of People v. Adrian Parke. Mr. Harris, you represent Ms. Parke. Would you like to proceed? Yes, Your Honor. Your Honors, I'm Ms. Joseph. I'm Assistant Defender Levi Harris, and as you mentioned, I'm delighted to be here this morning representing my client, Adrian Parke. May it please the court, Your Honors will recall that this is the case where Ms. Parke, who was a woman who was a housekeeper at the Drury Inn in Mount Vernon, and she was convicted of aggravated arson for a fire that took place there in 2015. We've raised three arguments in our briefs that the trial court violated Ms. Parke's Fifth Amendment rights by denying her motion to suppress statements, that the trial court committed a structural error when it violated Ms. Parke's Sixth Amendment right to counsel of her choice, and that Ms. Parke's 10-year sentence is excessive. Given our time constraints, my aim is to focus on the choice of counsel issue. However, of course, whatever questions you have about any of the issues, I'm happy to answer. Before you get started on the main argument that you want to make, could you give us your best argument as to the suppression of the video statements? Your Honor, I think that the... And the brief does a nice job of it. I'm just asking you to kind of highlight it for us. My highlight would be this, Your Honor. The question is whether a reasonable, innocent person in the defendant's shoes would have felt that she was not free to leave this interrogation or this interview. And I think that the totality of the circumstances that we went through, particularly given, and I don't want to... I've talked to my client about this. I don't want to play up her disability, but she is a person who has some difficulty understanding. And particularly when she sought permission to bring her husband with her to this interview to help her understand, and she does that not just with these kinds of things, but other things. And when she got there, they asked him to stay downstairs. They brought her upstairs and they said, you're free to go as soon as we have this conversation. You'll be going home today after we're done. That that would have led a person in her shoes, given her particular makeup, to believe that she was not free to leave until that interrogation was finished. And I understand that and I appreciate the nuances of your client and her situation. However, when you bring up the fact that she asked if her husband could join her and then he was left downstairs in the lobby, is it my understanding that no not your client nor her husband requested at that time to accompany her at the interview itself or into the interview room? There's not any indication on the record that that request was persisted in at that point in time. Okay. The request had been made, is it okay if I bring Jeremy with me? You know, that's her husband. And when they got there, you just wait down here. Again, what I would say to that, your honor, is she's a person who needs somebody to help her understand things and also needs help communicating what she's saying to someone else. Sure. And I understand that. But Jeremy was the one that was asked to wait downstairs and correct. There's no indication that he asked if he could accompany his wife. Correct. Okay. On the record. Correct. And right. Anything that we're aware of. Correct. As far as the interview itself, I won't speak for Justice Cates or Justice Scholar, but I think I would be safe to assume that we've all watched the interview, the video. And I'm just curious as to what makes that, I mean, I had a hard time watching the video and finding any reason to believe that she was not free to leave at any time she wanted. Well, I would say that the distinction is, your honor, whether she believed she was free to leave. And, you know, I think we talked about in the briefs, at least in the reply brief, but maybe in the opening as well, that by the very virtue of the fact of saying, you can leave as soon as we're done talking here today, that the converse would seem to be true that until we're done talking, you can't go. So that's the main gist of that position is that by that statement by the investigator, she did not feel she could leave. It wasn't the fact that the doors were closed, because obviously they weren't. It did not seem overly coercive. There were no raised voices or anything of that nature. So, I mean, the only thing that that claim hinges on is her belief based on the statement by the investigator that as soon as we're done, you're free to go home and enjoy the holidays with your family. Not just that, the totality of the circumstances. What I would say, your honor, is this. We're looking at a person who's a reasonable, innocent person who's in the defendant's shoes. I would say two things specifically. If my client were someone who had ordinary intellectual functioning, and if she had not been in a position of asking, can I bring my husband with her, and then being sort of surprised at the last minute, I don't think this would be a very plausible claim. Okay. I think if this were an ordinary person, we probably wouldn't be having this conversation. Okay. How big is your client? How big? Yeah, she seems to be a small woman, short of stature. I believe that's right. I want to say she's like 5'4", your honor. I could look it up and show you on Rebuttal if I looked on the website. When I look at the video, I look at a man who is the fire investigator, who's a very large man, who's sitting directly in front of your client, facing her, and he makes the statement, I think, only one time that you're going home because she starts crying and says she doesn't want her daughter visiting her in prison. But I think there's only five minutes into the video, and he starts calling her a liar. Correct, your honor. He repeatedly calls her a liar, and then 25 minutes into the video, the detective gets involved and calls her a liar. So what is your client thinking at that point when she's called repeatedly a liar and she's confronted by a huge man in stature and a detective who's got a badge and a gun? I'll say a couple things about that. One, your honor, I think it was even more jarring than it would have been to somebody if these people had been complete strangers. But this man, one of the reasons I believe that she was not completely terrified to go upstairs with him once her husband had been separated from her is she knew this man. This man was her husband's co-worker or somebody that she encountered socially because of work between firefighters and paramedics. So it would have been particularly jarring for somebody in that relationship to have I think you're lying. Even more so, somebody that you trusted and thought would believe your story. That's one thing. The other thing I would say, when you're pointing out the distinction between the size difference, it's a man, a big man versus a little woman, that's one of the things that they were litigating right before she sought to bring in Dwayne Verity instead of Brian Drew as her attorney. The state defense wanted to bring in evidence that she had been abused as a child and that that was part of the reason why she was very uncomfortable around men specifically and why she just wanted to be compliant with men and get them off her back, get out of the situation where she felt backed into a corner by men. Trial court didn't allow that. We're not arguing here that that was a reversible error, but that directly led to a discussion of strategy with Mr. Drew. Well, okay, the trial court's not going to let us talk about that. And then that's what led into this other thing. All of that's to say, to get back to your original question, your honor, I think this was a very big point for her. I think this was something that for Ms. Park would have been even more jarring maybe than a normal woman her size and somebody else who was a big investigator. What about the size of the room in this case? It didn't seem large to me. It didn't seem large. It certainly wasn't as small. I started my practice in Cook County and some of those tiny rooms where they've got somebody chained to a stainless steel thing. There are smaller rooms. This was not a particularly ample room. I believe when the Drury Inn people investigated her, they may have done that in the ballroom at Drury Inn or one of those places. This certainly wasn't a situation like that. It was a pretty tiny room. Right. You're out of time. Let me ask the justices if they have any questions since you wanted to talk about a different issue. Justice Barberis? I would ask since I sidelined his main argument to give him a couple extra minutes to go through what he wanted to. I'd like to hear his argument on the other issue. I would as well. Of course. Mr. Harris, would you like to take a few minutes and then we can always give the state a few extra minutes as I am at your honor's disposal. As long as you want to sit here, we'll talk. Why don't you give us a two or three minute discussion on your second issue that you wanted to reach? Okay. We know that there's a Sixth Amendment right to counsel and that part and parcel with that is that it's a right to counsel of your choosing. The law is clear that unless a trial court specifically finds that a defendant is trying to use her choice of counsel to thwart the administration of justice, then that right to counsel ought to be respected even if it inconveniences the state, the court. Some of the cases we cited, you already had the jurors ready to go, you had the witnesses in court ready to go, and it was still error to deny a continuance. In this case, the trial court didn't make any finding that Ms. Park was trying to thwart the administration of justice, but denied that continuance anyway. We know that from the law, anytime new counsel is specifically identified and they're ready, willing, and able to enter an unconditional entry, continuance should be granted. In this case, Mr. Verity directly answered, I am ready, I'm ready, willing, and able, and I am entering my appearance. However, he was not ready to answer ready for trial. The trial court conflated those two things and saying, are you standing ready, willing, and able to enter an unconditional appearance and to go to trial in five days? I think Mr. Verity, as any seasoned attorney or even a brand new attorney would have said, no, I can't go to trial on a class X felony in five days when this is the first time I've been in court on this, but that's not the standard of whether a continuance should be granted. I think we talked about it in our briefs that if that were the standard, if needing a continuance meant that your entry was conditional, then the only people who would ever get a continuance would be the ones who didn't need it and were ready to go to trial, and that doesn't make any sense. Let me ask you one question about that, though. It seems like the court alluded to its belief that this was somewhat of an effort to stay out of jail for a little longer when it pointed out that the defendant, her statement, I think, and I don't know the exact quote, but it was along the lines of, I met with Mr. Verity and I liked what he had to offer, something of that nature, but Mr. Verity's statement to the court was he had not reviewed the discovery, had not read the record, and had not familiarized himself at all with the case, and my understanding was that the court looked at those two statements as conflicting and thought, how could he have offered her anything that seemed appealing if he has no idea about the facts of the case? What could he have said to make her feel that way? So I'm just curious, what was it that made her feel like she was better off with him if he hadn't reviewed the case at all at that point? There are a few things I say about that, Your Honor. One is the case law requires that the defendant articulate an acceptable reason, and so in her, I mean... She really didn't. I mean, from my reading of it, she really didn't other than he's got some things that sound good to me or something along those lines. Well, Your Honor, I would respectfully disagree that she didn't. I would agree that Judge Geisel believed that she didn't and that it did not satisfy him. I don't think there's anything in the case law that says that judges are supposed to be looking behind what the defendant says and seeing, well, you know, what strategy did this one give and what strategy did this one give and why did you like this strategy better? Theoretically, maybe not on the eve of trial, but if my client had said, I want to go to trial with a guy that's got beautiful blonde hair and is not a bald guy like Mr. Harris, that would have been her right. So in this case, the fact that she said, well, I met with Mr. Drew, I lost confidence in him. I met Mr. Verity. I like what he had to say. My understanding is that they had a meeting after this court. They didn't specify which rulings, but the most recent rulings were this ruling on whether or not the defense can talk about the abuse that she suffered as a child. Brian Drew met with my client and Mr. Park after that to talk about, okay, how are we going to go forward with trial when we're not allowed to talk about this? In that meeting, she lost confidence. As soon as she lost confidence, her and Mr. Park went out to find a different attorney. Now, what Mr. Verity said that gave them confidence, or she said, I liked what he had to offer, maybe it's, I'm going to fight harder, or maybe Mr. Drew was going to give up or said, you got to cut a plea. I don't know what was going on there. The other thing I would say about that, Your Honor, is if Judge Kreisel had further concerns about that, all he had to do was probe a little more. I think they were all very careful in making sure that Ms. Park, her attorney-client privileges were being honored. They weren't trying to get everything out on the table for the state to know what the strategy was or whatever. He could have asked her to articulate a little more. When the court made its findings about why we're not doing this, the court was very specific in saying any further delay would prejudice the administration of justice. Not, I find that that's what you're up to, but it seemed clear that the primary thing that Judge Kreisel was interested in, and I understand this, I've never been a, probably never will be a circuit court judge, is worried about his docket. That was first and foremost, and he was not interested in granting any more continuances. The only continuance requested was like 45 days, wasn't it? Your Honor, Mr. Drew, who was the previous attorney, or I guess he was the only attorney given the outcome of this, said, I think four to six weeks would be sufficient. Mr. Verity was the one that the court should have been asking, how long do you need? The case law that we've cited is that it's incumbent on the trial court, if they're worried about an unreasonable delay, pin them down and say, how long are you going to need, Mr. Verity? Mr. Verity had been doing this long enough. He would have had a pretty good idea, I would think, how long of continuance he's going to need. Trial court never asked Mr. Verity, how long do you need? And I'm sorry. I apologize. Following up on what Justice Barberos was asking you, we don't know the circumstances as to who met with Mr. Verity, whether it was a conference from which he got the facts of the case and was being updated on the facts, even though he hadn't reviewed the file. He obviously had a meeting with the client, right? Yes, Your Honor. Okay. Thank you. Justice Shuler? Yes. And just for follow-up, if I recall, Mr. Drew didn't appear in trial then thereafter, is that correct? Correct. He sent his associate. All right. So perhaps some of, I mean, and we're speculating, I'm speculating, obviously, but perhaps that could have been some of the basis for her concerns. I mean, did she have an understanding of who was going to handle the trial? My understanding from talking to the client, and again, this is to horse the record, this is just in my communication with my client, is that she and her husband were not aware of who, that this gentleman was going to try the case until the day he showed up to pick and sherry. All right. The final thing, if I could, just let me say this, is a lot of times when we see these cases, it's an indigent defendant who's like, I don't like this public defender, give me a different one. In this case, this family of limited means went out and felt so strongly about getting a different attorney that they went and retained somebody, put their own money down to get him, to bring him in and represent her, and they were prevented from doing that. Okay. Thank you, Mr. Harris. You'll have a few minutes for rebuttal, unless the judges have some additional questions. Justice Barberas? Not at this time. Thank you. All right. Justice Scholar? No questions. Thank you. All right. You will have some rebuttal time. Ms. Joseph for the state? Yes. Good morning, Your Honors. Victoria Joseph for the people of the state of Illinois. May it please the court and counsel. Your Honor asked a few questions about the suppression hearing, and one of them was whether the defendant's husband could join the interview. He was brought to the interview, he was offered a seat, but neither the defendant nor the defendant's husband asked to be in the interview room. So, therefore, there was not an affirmative prohibition that the defendant of family or friends being in the interview with her. So, there has to be, Ms. Joseph. I mean, under the Slater factors, you had a fire arson investigator who actually knew the husband. So, this wasn't a stranger. So, if a friend of the family says, why don't you sit here, would there be an objection necessarily if they don't know what's going to happen next? I mean, it's reasonable to assume they wouldn't object. Well, when one doesn't ask for them to come into the room, it's usually interpreted as a neutral factor toward custody, Your Honor. Under the Slater factors? Under the Slater factors. Okay. Thank you. You're welcome. Also, as the court has watched the video, and we have the testimony from both Investigator Emmerich and the defendant herself, that she was responsive to all of the questions being asked. We're looking at whether she was able to, her ability to communicate, which was not affected even if she had low intelligence. That was not something that was known to the investigators. None of her additional situational sufferings of abuse or fear were communicated to anyone. We need an outward indication that there's some sort of developmental disability under the Slater factors. And here, her ability to communicate was not affected by the defendant's own admission that she was responsive to the questions. Also- I'm interested in this because the response of the defendant was very short, and she kept saying, you know, you know. And when you look at her demeanor, it seemed that she was having difficulty understanding the questions and trying to get out the full answer for the arson investigator who kept saying, I don't believe you, you're not telling me the truth. So when you talk about her ability to answer, are you talking about she could complete full sentences? What does the case law say about that? Well, the case law, the difference we have of the discernible characteristics that an officer or an investigator could exploit are those established in Bragg's, Your Honor. And there, we actually had a defendant who had severe retardation, where she actually needed her sister, who was a guardian, to basically translate for her during the interview. That was where the discernible characteristics were. The investigator who testified, he was not aware of these things about her. He felt she was able to answer the questions. She said she herself testified she was answering the questions. So we don't have here the exploitation through their conduct of any existing disability that was present in Bragg's. Okay. Thank you. Also, I know Your Honor talked about the confrontation of her statements not being the truth. We also need to look at the fact that her testimony at trial was that she didn't think she was in any trouble when she left the interview. And though her subjective understanding may not control the determination of custody, her actions, her words, her thoughts do bear on the overall atmosphere of the interaction and to how such an interaction would impact a person, their reasonable perception, and whether she believed the officers were actually conveying to them that she was the one who did it and she was the one who was in trouble. She did not believe she was in trouble. So those beliefs were not conveyed to her. As you pointed out, though, the standard is objective. It's not subjective. Right? It is. The question is, what does an objective person believe when they're continuously told repeatedly, you're not telling the truth, you're not telling the truth, and you have this investigator leaning forward and confronting the individual? It is a factor, Your Honor. It is not the dispositive factor. It is a totality of the circumstances, and that alone does not necessarily lead to a conclusion the entirety of the interaction was a custodial one. Do Your Honors have any additional questions on the suppression? Issue. What about the detective who comes in about 25 minutes into the interview and the mood of the investigation now changes? Isn't that one of the factors in Slater as well? It is, Your Honor. It is one of all of the factors. But again, the officer never raised his voice to her, never threatened her. They gave her time to respond. You did not have the badgering, scare tactic situation that was happening in Alfaro. You had people trying to understand what happened with the fire. So again, that alone does not shift it entirely into a custodial situation. I have no other questions. Okay. Any other further questions? No. As to the choice of counsel, the people maintained that new counsel was not ready to go to trial in five days. In fact, expressed it would be unethical for him to defend a class X felony in five days. So essentially, it would be ineffective assistance of counsel. So we maintain that he was not ready to make an unconditional appearance to provide competent representation. I know Mr. Harris suggested that the Attorney Verity did not give a specific amount of time he needed to prepare for trial. But for some reason, it's nagging in the back of my mind, I thought that he had said he needed about a month, month and a half to be prepared. I don't recall specifically, Your Honor. I may have imagined it, so. I have the same impression, Justice Corbett. All right. Well, I'm sure we didn't have the same dream. So I'm sure it must be somewhere in there. There may have been a statement, but we also know that the court was looking at the time the case had already been existing on its docket. It knew all of the issues that had already been addressed through various motions. It knew that Verity hadn't begun any significant work on the case, hadn't reviewed the file, hadn't talked to witnesses, hadn't seen any discovery, I don't believe. So we do have an understanding of knowing your existing attorney representing also the length of time that was needed based on the work that had been done and the understanding of the complexity that the case involved. But what about this notion, though, that there hadn't been prior continuances? I believe that all the prior continuances in the case had been by agreement except for maybe perhaps one. I believe it was by agreement except for one. So, I mean, if this wasn't, it doesn't appear that she'd made prior attempts to delay this matter. Is that accurate? It does not appear on the record, other than the fact that as the court acknowledged, based on a very kind of vague expression, essentially, that I like this other attorney better, that knew that she was not in continuous custody, knew she'd been cooperating with defense counsel for 32 months, I believe, that I do think the court found that this was a, without using the word, that this was a delay tactic, was at the weight of you're now making this sudden change right when you know what you're potentially facing and that you are a mandatory prison sentence. And the court was concerned that this was prolonging her chance to be free. For just as easily, though, she could have lost faith in her attorney, though, correct? We do know that the case in Friedman, that you can't seek to avoid the effect of due diligence, arguing a sudden loss of confidence. And the fact that the court did not find her articulation of her reason being particularly persuasive in being acceptable, and they were not, the court was not satisfied with the request, especially because you had an attorney that you were bringing in that you like him better, but you have an attorney who represented, I haven't really done anything on the case, so. Wasn't she ultimately represented by someone who also stated that they had done very little on the case? That is correct, Your Honor. But at that point, you're looking at the information before the judge at the time the judge is making it. So it's hard to say it was an abuse of discretion when something later down the road altered what happened. That was not information that was before the court that was affecting the court's decision. So it cannot abuse discretion for a factor it does not know was going to happen and has not been represented to it. Whatever did the trial court make to really inquire as to how much delay it would cause its docket? I think the court did inquire. It knew how long the matter had been pending. It knew the existing complexity of the case. I don't know. My question is, what inquiry did the court make that day when it was faced with this decision on how to go forward? Oh, my goodness. I know there was a case, and I cannot remember the name of the case, of the fact that you don't have to make full inquiries if you're already aware based on your knowledge of the case, Your Honor. Well, Mr. Harris disagrees with you. And that's fine. I think that's part of his job is to disagree with me. But there was some inquiry and the court can base it on its knowledge of the case as well. Okay. I see where I asked back to my original question. Page 51 of the appellant's brief, it does say that the court never asked Verity how much time he would need to get ready for trial. Drew asserted that a month and a half would be sufficient. So that's where my confusion, that's where that month and a half came in. It was Drew who said that, not the- Yes. The court specifically called Drew in to extend the inquiry into this request, and it was her current counsel who made the estimate based on their own knowledge of the case. Again, when you have an attorney who hasn't reviewed anything, it would be a hard estimate to make at that time. So you're looking at the person who already has expertise on the complexity of the case. You're looking at the court who already has knowledge of what's happened and the length of time they would suspect after all of the work that's already been done on the case. So this isn't a situation where the court is entirely unaware of the complexities of the matter. This is one where you've had a lot of pretrial motions that have been presented and argued. And part of that does go into the court's decision of knowing how long the case has already been in existence and the complexity with which it would be going forward. I do see that I am out of time. Do your honors have any more questions? I do have one other question. I have two questions actually. First of all, when Justice Barberos mentioned the month and a half, Mr. Verdi, he didn't object. He didn't say that that was not a fair amount of time, right? No, he didn't. I mean, he didn't represent otherwise that, no, I could do it in less or I would need more. So there was no really comment from anyone else on that being an unreasonable number to assume would be. So if we accepted that the court was listening to Mr. Drew and Mr. Drew represented that it would be a month and a half, you're only talking about a continuance of 45 days potentially, right? Yes, that would be a calculation of a month and a half. Going back to the in custody, what about the use of the religious factors in confronting this defendant about how it would make her feel so much better in telling the truth because she would be forgiven? Well, your honor, the court did make a finding as to that. It did find that approach tasteless, but it recognized it was not illegal. It, the people respond that at this point, it seemed like the investigator or the officer was reaching for a common background with the defendant to build rapport and make her more comfortable in allowing her to talk about the case. I mean, it would be, it would almost be invoking like saying another common commonality of, oh, we're both scouts together on scouts honor, you should be encouraged to tell the truth. So again, it is one factor, it is not dispositive. The court did recognize that specific invocation as part of its analysis and did not find it, found it tasteless, but not illegal. Okay. Thank you for your arguments. Justice Barbera's questions. I just would like one very, very brief statement. If you can do it in one or two sentences, that'd be great on the severity of the sentence. My understanding is she was facing six to 30 and she got 10. Is that correct? That is correct, your honor. Okay. And is, is, do you have any comments with regard to defense's position that that was excessive? Outside of what's in your brief, of course. I don't believe outside of what's in our brief. I would just, I would just say to the, one of the cases that defendants cited for persuasive authority, Roskowitz actually is very helpful to the state's case. The fact that the court can consider the elements of defense with respect to the seriousness of offense and the people maintain that that's what the court was really doing here. It wasn't, it wasn't the mere statement that this caused harm or threatened to cause harm. It was going into the factual details of the harm that, that did potentially exist. Also the fact that this was her opportunity to shine and hoping she could become a hero. You know, this was a situation where like Roskowitz, we have a normally law abiding citizen who wanted to be a hero and yet set a fire. And, and even her daughter testified, she sometimes acts irrationally. So I don't think the court made an error in, in being concerned that we, that the court didn't know that she would engage in the conduct again. And, and your honors this court has found that is the lack of explanation for the conduct was relevant to determine whether she, she could be a continuous threat in the future. So that, does that explain what I consider to be a somewhat odd statement the court made during sentencing about the fact that you're, you know, completely law abiding citizen up to this point, 38 years old. And then you do something like this that potentially jeopardizes over 200 people's lives. That is, it was a very odd comment by the court. I don't remember specifically what it said, but is that what you're saying that the justification for that comment was that if you can be a little law abiding life up till I think there's no way to determine, there was no way for the court to determine whether she would engage in the conduct again, because it was so it, it was, I think the word may have been concerning. And I think it was, and as the court recognized in Roskowitz, where the husband came in and fired a gun at his wife and had no, or at least didn't identify a reason he could do that. This court found that his lack of explanation was relevant to whether he continued to pose a continuous threat because the court couldn't determine whether he would engage in the conduct again. Thank you. I have nothing further. Justice Scholar, no questions. All right. Thank you, Ms. Joseph. Mr. Harris. Okay. Let me take these in reverse order. First of all, what, what Judge Kreisel said that Justice Barberos and Ms. Joseph were just talking about was, I think this in a sense makes you more dangerous. And so that was our objection, not just that the court could not find mitigating. Well, okay. She's unlikely to commit a crime in future and these circumstances are unlikely to occur. Fine. You, you don't find mitigation, but by saying, I think this makes you in a sense more dangerous, it's, it's making it aggravation, whether the court used the words aggravation or not, by saying you're 38 years old, you're a mom, you're a Sunday school teacher, whatever. And then you do this. This makes me more worried about you being in the community because you had never, you had never had a track record of doing this before. So it's, you pardon my language, it's damned if you do and damned if you don't. If you got a long history of criminal activity, then okay, you're a recidivist. If you have no history of criminal activity, well, that makes you more dangerous because this, you're just a loose cannon out there. So that's the sentencing issue. I want to go back then to the choice of counsel issue. I disagree with Ms. Joseph respectfully. She said, well, the court was not aware of the situation with Brady Allen, Mr. Drew's associate at the time that it ruled on the motion to substitute attorneys and continuance. I will say that the court was aware that Brady Allen had never had any involvement with this case as of October 3rd, before the case started going to on October 9th. Perhaps on October 4th, when the court denied the motion, the court didn't know that Mr. Drew wasn't going to show up in five days. But when Mr. Drew didn't show up in five days and it was October 9th, and it's like, okay, where's Mr. Drew? Mr. Allen, you're here, but you told us five days ago, you've never had any involvement with this case. The court certainly knew at that time that Ms. Park was going to trial with an attorney who was just as unprepared as Mr. Verity was, and that had been the hang up there. So I disagree that the court was completely unaware of it. I also think that it's going to be always the case when an attorney comes in, they're a brand new attorney, they show up, they've made their appearance, and they're there to argue their continuance. Your Honor, I need to get up to speed on this case. It's always going to be the case that they've not seen the discovery. Discovery is with the current attorney. Almost in every instance that I've seen where a new attorney comes in, the very first thing they file after their appearance is that motion for discovery because they've got to get the stuff in their office so they can see it. So we wouldn't have all this case law about what you need to do to get that continuance. If it were the situation that nobody's entitled to that continuance, you've got to be ready to go to trial. The amount of time that had been pending before this situation, I don't think it's particularly relevant as Justice Schoeller pointed out. None of these things were over the state's objection. These were all by agreement. These were the normal course of pretrial litigation. You had a task evaluation. You had a fitness evaluation. You had a motion to suppress. You had a motion in limine from the state to bar this defense from bringing in certain types of evidence. So this wasn't like, oh, let's kick the down the road. We're not ready to go to trial. I'm not ready to go to trial. They were actually doing stuff. And that delay was not unreasonable. And this was the first time that she had asked for a delay, particularly for new counsel. I would also say, again, I touched on this a little bit in my opening, but the idea that anybody really, but in particular, a family in this situation would go out and spend extra money to hire a new lawyer just to buy a few more weeks out of jail before trial strikes me as absurd. That's all I would say about that. If I can back up then to the first issue in my 38 seconds, counsel said that there was no prohibition on Mr. Park going upstairs with his client. I would reiterate that they asked, the only reason she asked, can I bring my husband was to have him in the room with her. I mean, it's not like she wanted somebody warm and cozy sitting downstairs waiting on her so she could see a big smile when she came back down those stairs. She made the request for him to be in the room with her. Well, that's just speculation on your part. There's nothing in the record that suggests or verifies that that was her reasoning. I might agree with your speculation, but I don't think there's anything that we can hang our hat on that says that's the sole reason she asked. I don't necessarily think so, but I also think what other reason would she have had and then for them to, I guess, there's no case law on this about going to fire to persist, persist, persist, ask three times whether he can come, and then once it's denied three times, that's all you have to ask. The last thing I guess I'll say, unless you have other questions, is that I think that the very fact that she left that day thinking she wasn't in any trouble gives you an idea exactly of sort of the level of functioning that we have here with my client. I don't think any person of an ordinary intellectual functioning would have walked away from that interview and thought things are going to be great, let's have Christmas, and this is all going to be behind us. Because she did, that tells you the position that she was in intellectually when she was sitting there in that interrogation in the first place. Okay, your time is left, Mr. Harris. Justice Barberis, any further questions? No, I would comment though that I appreciate both parties' arguments on this and the briefs. Okay, Justice Scholar? No further questions, thank you. All right, I echo Justice Barberis' sentiments. You both did a great job in this case. As you can tell, the justices have been very interested in it, and we will take this matter under advisement and issue an order in due course.